**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **CYNTHIA FIRESTINE** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.  1:01-CV-0414** |
| | ) | |
| **PARKVIEW HEALTH SYSTEM, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Plaintiff, Cynthia Firestine ("Firestine"), brought the instant lawsuit alleging retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., after she voiced complaints at what she perceived to be unlawful discrimination based on her Catholicism. After a three day trial, a jury agreed with Firestine and concluded that the Defendant, Parkview Health System, Inc. ("Parkview"), engaged in unlawful retaliation.

Before the court is Parkview's "Motion to Alter or Amend Judgment" pursuant to Fed.R.Civ.P. 59(e) filed on January 28, 2005.  In this motion, Defendant has incorporated by reference its previous Motion for Judgment as a Matter of Law pursuant to Fed.R.Civ.P. 50 and supporting brief, thereby renewing that motion.[1]  Plaintiff responded to the Rule 50/59(e) motions

---

[1]For clarification, the Court is construing Defendant's request to incorporate its previously filed Motion for Judgment as a Matter of Law as a Renewed Motion for Judgment as a Matter of Law under Fed.R.Civ.P. 50(b).  This is a reasonable construction in light of the Court's January 10, 2005, order in which it denied the Defendant's Motion for Judgment as a Matter of Law made at the close of the evidence but anticipated the refiling of such a motion under Fed.R.Civ.P. 50(b).  *See January 10, 2005, Order, p. 12* ("Defendants' Motion for Judgment as a Matter of Law taken under advisement at the conclusion of trial is DENIED subject to refiling in accordance with Fed. R. Civ. P. 50 once judgment is entered.").  Moreover, the issues raised in the Renewed Motion appear identical to those raised in the Motion to Alter or Amend Judgment.

on February 14, 2005 to which Parkview replied on February 22, 2005.

On March 10, 2005, after reviewing the substance of these motions, the Court entered an order seeking supplemental briefing. Supplemental briefing was completed on April 13, 2005. For the following reasons, Parkview's Renewed Motion for Judgment as a Matter of Law and its Motion to Alter/Amend Judgment will be DENIED.

## APPLICABLE STANDARDS

On a Fed.R.Civ.P. 50(b) motion, this court's review is limited to whether the evidence presented, combined with all reasonable inferences permissibly drawn, is legally sufficient to support the verdict when viewed in the light most favorable to the nonmovant. Fed.R.Civ.P. 50(b); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000); *Mathur v. Board of Trustees of Southern Illinois University*, 207 F.3d 938, 941 (7th Cir. 2000). In other words, the test is whether no rational jury could have returned a verdict for the plaintiff. *Mathur*, 207 F.3d at 941; *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 630 (7th Cir. 1996). In making this determination, the court may not reweigh the evidence, resolve conflicts in the testimony against plaintiffs, or override the jury's determinations as to the credibility of witnesses. *Grassi v. Information Resources, Inc.*, 63 F.3d 596, 599 (7th Cir.1995); *Soto v. Adams Elevator Equipment Co.*, 941 F.2d 543, 549 (7th Cir.1991); *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988). The court must be particularly cautious in employment discrimination cases not to substitute its own view of credibility or weight of the evidence for that of the jury. *Tuorhey v. Chicago Park District.,* 148 F.3d 735, 740 (7th Cir. 1998). "This is because employment discrimination cases often involve sensitive and difficult issues of fact, and plaintiffs often have only circumstantial evidence on which to rely." *Tart*

*v. Illinois Power Co.,* 366 F.3d 461, 472 (7th Cir. 2004).[2]

## FACTUAL BACKGROUND[3]

Mindful of the above standards, the court turns now to the facts underlying this lawsuit.

The impetus for this litigation is a single sentence,  in the midst of an otherwise positive annual

performance review, indicating that the plaintiff should "be continually aware of the need for

confidentiality and to maintain a quiet and professional manner in patient care areas."  Strangely

enough, this annual performance evaluation is the critical event in this case. As a result, the facts

shall be organized in three sections: events leading up to the evaluation, the evaluation itself, and

finally, post-evaluation events.

Firestine was employed as a secretary in the oncology department at Parkview until March

28, 2001, when she was removed from that position, and ultimately discharged, after complaining

of unlawful discrimination.[4]   At the time of her discharge, Janette Bowers ("Bowers") was

Firestine's director.  Prior to becoming Firestine's director, Bowers was a supervisor working under

Lynn Gerig ("Gerig") in the department and was familiar with Firestine's work.  Gerig preceded

Bowers as Firestine's director.  (See stipulations in Court's Instruction No. 7).

---

[2]In contrast, motions under Rule 59(e) serve the limited function of allowing the court to correct manifest errors of law or fact or consider newly discovered material evidence. *See Neal v. Newspaper Holdings, Inc.,* 349 F.3d 363, 368 (7th Cir.2003); *Oto v. Metropolitan Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir.2000) (manifest error is wholesale disregard, misapplication, or failure to recognize controlling precedent). In other words, Rule 59(e) does not allow a party the opportunity to undo its own failures or present new evidence or arguments that should have been presented earlier. *See Moro v. Shell Oil Co.,* 91 F.3d 872, 876 (7th Cir.1996). Whether to grant a Rule 59(e) motion "is entrusted to the sound judgment of the district court." *Matter of Prince,* 85 F.3d 314, 324 (7th Cir.1996).

[3]Conflicts in the evidence are resolved  favorably to Firestine and all reasonable inferences are drawn in her favor.

[4]Parkview disputes that it removed Firestine from her position and claims that she voluntarily left the position because of perceived discrimination.  Given that the jury found in her favor on that issue, under Fed.R.Civ.P. 50, the Court must likewise construe the facts in her favor.

I.       **Firestine's Work Environment Prior to the Performance Evaluation**

While employed at Parkview, Firestine made a number of friends, including Karen Slabaugh ("Slabaugh"), Gerig, and Bowers. (Firestine Test. at 19, 20; Slabaugh Test at 141). She would socialize with these individuals, have lunch with them, and go on various excursions, such as shopping trips, with them after hours. (Firestine Test. at 18 (testifying as to Gerig: "We met for dinner. We ate lunch together. We went to Vera Bradley's for sales..."); at p. 20 ("We all ate lunch together, so we talked about everything that was going on in our lives")).

In the spring of 2000, Firestine made a personal decision to convert to Catholicism and began taking classes to accomplish the conversion. (Firestine at 40). Firestine testified that her conversion process was a "big step" and "thrilling," "something very important to our family." (*Id.* at 41-42) For this reason, she shared this news with her coworkers at Parkview, particularly Gerig, Bowers, and Slabaugh. (*Id.*). Firestine also began attending the Catholic mass offered during lunch at Parkview as frequently as possible. (*Id.*).

Gerig, Bowers and Slabaugh were very negative about Firestine's conversion to Catholicism:

For beginners Karen [Slabaugh] she was very nonsupportive about it. Negative. And I don't know specifics of what she said. It was how. She just gave me a hard time about it all the time.

And Janette [Bowers] would roll her eyes when they would say, "Are you ready to go to lunch?" And I would say, "No, I'm going to mass." And they would just like ...you know roll their eyes.

Janette had made comments to me that she used to be Catholic and that she wasn't any more and she made me feel like there was a reason why I shouldn't be doing this.

And she had talked to me one-on-one at one points and said that, "I didn't know how you feel about me being gay because I'm no longer Catholic, and Catholics don't believe in my lifestyle." And she had made numerous points to point it out that it was on her mind.

And in December of that year was kind of the top of the mountain for me. We had just casually talked about Christmas presents and I mentioned that I was getting my son the Saints book because he was really interested in Saints and the

4

stories....And that's when Janette started in and said that he would feel guilty for the rest of his life for everything he did and that I was going to be sorry that I did that.

(*Id.* at 43).

At some point during her friendship with Bowers, Firestine suspected and later confirmed that Bowers is a lesbian. (Firestine at 87).  According to Firestine, when Bowers confirmed she was a lesbian, Bowers told her, "I didn't know how you would feel about it because I know you are Catholic and Catholics don't believe in their lifestyle."  (*Id.* at 88).  Firestine responded, "Janette, we are friends.  We've been friends all along and it's not going to change my opinion of you.  What you do personally with your life I am not judging.  I am not the Lord."  (*Id.*).  According to Firestine, neither her work relationship or friendship with Bowers changed after she learned that Bowers was gay.  (*Id.* at 89).

## II.     Firestine's Annual Performance Evaluation.

On March 13, 2002, Firestine received a copy of her annual performance evaluation from Bowers.  At that time Bowers had only been Firestine's supervisor for a few weeks, although she had worked in the department for some time and was familiar with Firestine's work.   Firestine reviewed her evaluation in the presence of Bowers and Cassie Carney ("Carney"), an interim manager.[5]

The evaluation contains a place for a numerical rating from both the employee and the reviewer as well as commentary from both regarding certain performance areas.  The numerical score is then calculated to determine whether a merit increase is warranted.  Based upon her numerical score, Firestine received a 2% merit increase for her performance and, while the evaluation shows

---

[5]According to Bowers, Carney was a new manager and Bowers had her participate in the meeting "to train her on how to do evaluations and ...because she would be working with Cindy and so that Cassie could be clear on her goals for the following year."  (Bowers at 187).

some areas for improvement,  the numerical rating given to her in each category shows that she met

or exceeded the requirements of her position in each category evaluated.  At the end of Firestine's

evaluation, Bowers wrote the following comments:

> Cindy is improving in her role as administrative secretary.  She has taken on
> additional duties due to the addition of a nursing manager.  Cindy maintains
> calendars for the director/manager very well.  Cindy is instrumental in planning
> parties and carry-ins for various staff members. Cindy needs to be continually aware
> of the need for confidentiality and to maintain a quiet and professional manner in
> patient care areas.  Cindy needs to learn how to prioritize all aspects of her job in
> order to best assist the director/manager.

(Trial Exh. 6).

## III.    Events Post-Dating the Evaluation

Firestine had no quarrel with the numerical portion of the evaluation but perceived the

commentary portion of the evaluation to be negative.  She was hurt by what she considered to be false

and inaccurate statements written in the evaluation by Bowers.  For instance, on the portion of the

evaluation reading "Prepares documents as requested through computerized word processing and

transcription..." Bowers indicated that Firestine "has difficulty completing this work on time," an

assessment with which Firestine disagreed.   Firestine also disagreed with Bowers' statement in the

evaluation that she needed to respect patient confidentiality and work on maintaining a positive

attitude while at work. Although she was taken aback by the comments on the evaluation, she did not

immediately comment to Bowers on the content of the evaluation.  (*Id.* at 47).  Firestine did, however,

take the evaluation to Gerig and asked her whether she agreed with the comments on it and whether

she had any input in the evaluation process, since she had been Firestine's director prior to Bowers.

(*Id.* at 50).  The answer to both questions was "no."  (*Id.*).

After thinking about the evaluation overnight, Firestine became extremely upset over the

comments written by Bowers. Firestine believed confidentiality was "crucial" to the position she held at Parkview: "it's critical in a hospital environment.  And I looked at that and if I would have tried to transfer to another job, what kind of director would have hired me with that on my eval?"  (Firestine at 33, 47).  During trial, Gerig also testified that the performance evaluation process is important at Parkview and that a breach of confidentiality is a concern in the medical profession.  (*Id.* at 44, 54).

Prior to receiving this evaluation, Firestine had never been warned, counseled, or disciplined about patient or staff confidentiality concerns.  (*Id.* at 48).  Firestine believed her job was in jeopardy based on the comments relating to patient confidentiality on her evaluation.  (*Id.* at 49).  As a result, Firestine typed up a "rebuttal" to attach to her evaluation explaining her position on the comments written by Bowers.  (Pltf's Trial Exh. 7).

### (A) *The March 14 Meeting with Bowers*

Firestine asked to meet with Bowers on March 14 to discuss the evaluation further and, in particular, to discuss the comments Firestine believed were inaccurate and overly harsh in her evaluation.  Bowers agreed to the meeting but insisted that Carney be present.[6]  (Bowers at 187: "I felt it important to include Cassie because she had been in the first meeting and that we could work on the meeting together with the concerns about the evaluation.").  During this meeting, Bowers told Firestine that she had observed that Firestine had a loud demeanor and voice in the patient care areas. (Bowers at 182).  Further, Bowers told Firestine that she had not completed certain tasks, such as typing minutes of meetings, as quickly as Bowers would like.  Firestine was emotional at this meeting, and Bowers claims she offered Firestine a second level review meeting wherein a second evaluator

---

[6]Bowers also testified that she wrote in her notes of the meeting that Carney was present as a witness to the conversations between herself and Firestine.  (Bowers at 187).

would review the evaluation.  (Bowers at 192).  Bowers then set up an afternoon meeting with Eileen

Brackett ("Brackett"), Senior Vice President of Patient Care and Bowers's supervisor, so that Brackett

could review the evaluation and present her thoughts to Firestine and Bowers. *(Id.*).

### *(B) The March 14 Meeting with Kari Vanness*

In the interim, Firestine contacted Kari Vanness ("Vanness"), Parkview's Employee Relations

Specialist, to discuss the evaluation.  Firestine testified about that meeting as follows:

> I told Kari that I had had an eval from Janette and had some comments that I was concerned about.  I went down through the eval with her – everything that was written I had a concern with.
>
> I told her that I had the concern of there being two people in there and that I felt [I was] getting dumped on.
>
> I told her about trying to resolve it with Janette the next day, which was that day, and that I had went over the comments and that she had gotten very angry, very worked up and to the point where she was copying my file.
>
> She got very defensive over the comments she did make instead of explaining them.  And I went in to tell her that I felt that this was because I was Catholic and Janette has a gay lifestyle.
>
> That I told her was because of the fact that she had made comments through the past year about that, so that was on my mind of why would she do this....And I needed Kari to be a center person and get this resolved.
>
> And I told her also that I feared retaliation because I used going to HR as a last resort.  I did not want to have to do that.  I did not want trouble.  I wanted to do my job and I felt there was no choice...
>
> ...I told her about the conversation at Christmas that she made the comment about how I was raising my children... she felt that I was harming my child by saying that he was going to feel guilty for the rest of his life for everything that he did.
>
> I told her about the comment of going to mass and rolling the eyes and that when we had talked about it she had brought up the fact that she did not know how I would feel about her being gay because Catholics don't believe in the lifestyle.  She was the one that brought that up.
>
> And I told her all that stuff.  The stuff that had happened over the year.

(Firestine at 65-67).

Firestine testified that Vanness took notes throughout the meeting, (*Id.* at 67, 69)[7] and that Vanness told her that she would talk with Bowers and get back with Firestine.[8]  Thereafter, Vanness contacted Bowers and arranged for Bowers, Vanness and Firestine to meet.  Firestine, however, took a medical leave of absence under the FMLA (see below), so this meeting did not occur.

### (C) March 14th Meeting with Brackett

After the meeting with Vanness, Firestine was summoned to a meeting with Brackett, Bowers, and Carney.   Firestine was extremely emotional.  According to Bowers:

> Eileen had looked over the evaluation and thought it was fair and objective and had said that to Cindy.  And then Cindy was again crying.  So there weren't a whole lot of words or communication because Cindy was very upset...We tried to ask her if she could verbalize her concerns and she just said that she needed to get to a doctor's appointment and we ended the meeting.

(*Id.*).

---

[7]

| Q: | You said Kari took notes? |
|---|---|
| A: | Yes. |
| Q: | Was Kari writing notes while you were telling her about the negative Catholic comments by Janette? |
| A: | Yes. |
| Q: | And was she writing notes when you were telling that you felt Janette was discriminating against you? |
| A: | Yes. |

(Firestine at 69).

[8]Vanness' account of this meeting is in stark contrast to Firestine's.  Vanness testified that the Human Resources Department does not get involved with performance evaluations and it does not make changes to an evaluation.  Vanness testified that "it's kind of like a basketball game.  We are in the stands and the people down on the floor are the ones that need to make that determination."  (Vanness at 104).  Thus, according to Vanness, when she met with Firestine, she explained the performance evaluation process and that she could not make changes to the evaluation.  (*Id.* at 109). Vanness denies that Firestine mentioned Catholicism, lesbianism or discrimination during the meeting.  (*Id.* at 111).  Vanness did, however, agree to facilitate a meeting between Bowers and Firestine wherein the two could further discuss the evaluation.  Vanness denies taking notes, however, and testified that "there was no need" for her to take notes since she was only facilitating a meeting between Bowers and Firestine.  (*Id.* at 127).

Brackett reviewed the evaluation and thought it was a fair evaluation.  (Brackett at 96).  She did conclude, however, that there was tension between Bowers and Firestine:

> At that point in time it was pretty evident that the working relationship was not the best.  Cindy was not happy with the evaluation and I can't recall all that went on.  It was just pretty obvious that there was some tension there.

(*Id.*). Brackett then relayed to John Dortch ("Dortch"),  the Vice President of Human Relations, her conclusion that Bowers and Firestine could not continue working together. (Brackett p. 100).[9] According to Brackett, Firestine did not mention discrimination, Catholicism or the fact that Bowers was a lesbian in this meeting.

Firestine eventually left the meeting to attend an appointment with her psychologist.  After seeing Firestine, the physician placed her on an FMLA leave of absence until March 28, 2001.

### (D) *Events Occurring while Firestine was on FMLA Leave*

When Firestine left Parkview to attend her doctor's appointment on March 14, she was visibly upset and crying.  (Firestine at 82).  Slabaugh noticed Firestine's demeanor and called her out of concern at her home that evening.  Firestine explained to Slabaugh what had occured during her earlier meeting with Bowers.  (Firestine at 83).  Firestine was still upset and told Slabaugh that she believed that Bowers had written the comments "because I'm Catholic and Catholics don't

---

[9]  Q:     Did I understand you to say that you had made the determination that Cindy and Janette couldn't continue to work together because of this tension between them?
A:     Yes
Q:     Did you relay that to someone?
A:     To John Dortch.  To Human Resources.  I remember making a call.  Now whether or not I left it on voicemail or if I talked to them personally I can't remember.  I did, I believe, at some point later talk to him personally about the situation that I really didn't feel that that was a good working relationship...
...Q:   Did you ask them to do something about –
A:     I asked them to find her another position.

believe in her lifestyle." (Firestine at 83; Slabaugh at 149). Slabaugh testified that Firestine also mentioned filing a lawsuit and that she told Slabaugh that "this has gone on for about a year." (Slabaugh at 150). Firestine denies this statement. Regardless, the conversation ended shortly thereafter.

The next morning, Slabaugh reported to work and was visibly upset. (Slabaugh at 151). Upon exiting the elevator, Slabaugh ran into a coworker who inquired if she was all right. Slabaugh responded that she had some information and she wasn't sure what she should do with it, that she was sorting through it to do what was morally right. (Slabaugh at 152). Slabaugh testified that she believed she had a moral obligation to tell Janette that Firestine was planning legal action. (Slabaugh at 164). Slabaugh went to Bowers' office:

> I told Janette that Cindy had called me the evening before and ... said that, 'She felt that your performance eval was invalid based on the fact that you are prejudiced against her. That because you are a lesbian and because she is Catholic and she is against that lifestyle. I told her exactly Cindy's statement about her husband being very upset, that he intended to get a lawyer and take legal action. I told her everything.

(Slabaugh at 159; Bowers at 196).

Subsequently, Bowers contacted Dortch and Vanness to meet with them. According to Bowers, the two were on the diversity council with her and she believed "they would be friendly to the Lesbian issue." (Bowers at 200). During the meeting, Bowers relayed the substance of her conversation with Slabaugh to Dortch and Vanness. Bowers told Dortch and Vanness that "Cindy feels she got a bad evaluation and that she thinks it's because she is Catholic and I'm a Lesbian." (*Id.* at 201).

Bowers testified that she wanted to talk with them about the lesbian issue because it was a personal issue that had come out in the workplace. (Bowers at 202; Dortch at 142: "she [had]

11

concerns about her work environment because the comments that had been made she was thinking that would have some impact on how the employees would view her."). Vanness testified that Bowers's "purpose was to discuss with us what would happen if her Lesbianism would come out. How she would handle it and she needed guidance on how to handle it." (Vanness at 134). Although Bowers relayed Firestine's belief to Dortch and Vanness that the evaluation was poor because of religious discrimination by Bowers, neither Dortch nor Vanness pursued that information further. Vanness stated that no investigation of Firestine's belief of religious discrimination occurred because:

> That was a conversation that Janette brought forward on concerns of a sexual orientation comment. That was not Cindy bringing forward anything.
> No, that would not have – that would not have had me assume that she felt she was being discriminated [sic]. The employee has the obligation to bring that forward to the employer for us to know that they feel that way. We don't assume they feel that way nor do we suggest that they feel that way.

(Vanness at 130).

### *(E) The March 28 Meeting*

Firestine returned to her position at Parkview from FMLA leave on March 28. Upon her return, she was directed to Vanness's office to discuss "a conversation that [Vanness] needed clarification on and it had something to do with the Catholics and myself." (Firestine at 81). Firestine knew immediately what conversation Vanness was referencing and testified:

> I said that I believed that I was being discriminated against by Janette regarding why the comments were written on there because I'm Catholic and Catholics do not believe in the gay lifestyle.

(Firestine at 81). Vanness, however, testified that Firestine did not make a discrimination claim during this meeting nor were the words Catholicism, lesbianism, or discrimination ever mentioned. (Vanness at 119).

12

Vanness told Firestine that Janette was very angry about Firestine's comments and did not want to work with Firestine anymore.  (Firestine at 85).  Vanness then told Firestine that she was being removed from her secretarial position:

> A.    She said that I would no longer be working on the fourth floor and that she was going to set me up with the best recruiter and that we were going to find a job because this was going to  work out and this was fine.
> And, I'm like going, "You mean I've lost my job?"
> "Well, you know, yes, she does not want to work with you anymore,so we are going to send you down [to] the recruiter, and we are getting ready to go and meet Eric."  And that's when I really lost it.

> Q.    Did you ever get to tell Kari at that meeting on the 28th that you thought this was all because of your Catholicism and the fact that that faith doesn't believe in the gay lifestyle?
> A.    I tried to tell her that, but everytime that I tried to explain why I felt that way, she was cutting me off saying you know, "That's not why.  It's just that you two cannot work together.   You had a clash.  It's just that it's best to leave it.  It's not that."

(Firestine at 86).  Vanness then took Firestine to meet with  the recruiter, Eric Weeks ("Weeks") who implements Parkview's internal recruitment program.[10]

Within a week of leaving Parkview, Firestine concluded that "they weren't going to look [for a job] and I needed a paycheck, so I needed to go find a job myself." (Firestine at 96, 128).  Firestine then ceased any contact with Weeks and secured a job at United Art and Education within nineteen days of leaving Parkview.  Forty-two days later, Parkview formally terminated Firestine.

## IV.   Parkview's Efforts to Comply with Title VII

Parkview has an anti-discrimination policy ("the Policy") in its Personnel Policy Manual. (Trial Exh. G2). The Policy reads:

---

[10]Under the internal recruitment program, Parkview employees removed from one position may work with an internal recruiter to find another position within Parkview.

> [Parkview] will provide equal employment opportunity with respect to all aspects of employment (recruitment and selection of new employees, promotions, transfers, compensation, training, benefits, terminations and other terms and conditions of employment) to all without regard to race, color, ethnicity, religion, sex, sexual orientation, national origin, age, marital status, physical and mental disability, parental status, housing status, source of income or military status in accordance with applicable federal, state and local EEO laws.

Section IV of the Policy reads:

> Employees who feel that their equal employment rights have been violated should contact Human Resources.  These individuals will conduct a prompt and thorough investigation, and institute corrective action as appropriate.

(*Id.*).

In addition, Parkview has a written policy in its Personnel Policy Manual which explicitly provides that Parkview does not retaliate against individuals who complain of discrimination:

> ...Employees who feel they have been treated in any manner inconsistent with established policies may question or challenge a decision or action through [Parkview's] complaint or grievance procedure.  Employees who utilize the complaint or grievance procedure will not be discriminated against or suffer any reprisals for using the procedure.

 (Trial Exh. G1).

Parkview presented evidence at trial that it distributes an Employee Handbook ("the Handbook") to all employees upon hiring.  (John Dortch Test. at 137, Trial Exh. F).  This was confirmed by Firestine, who testified that she received a copy of the Handbook.  (Firestine at 14).  This Handbook indicates on the cover page as well as on page five that Parkview does not discriminate on the basis of race, color, sex, religion, national origin, disability or other protected classifications.  The Handbook goes on to describe in detail the affirmative steps Parkview will take to "assure equal consideration and opportunity for all applicants and employees."  (Exh. F at 5).  In particular, the Handbook provides that Parkview will "...[i]nvestigate upon request, the circumstances

14

of any person who believes that he/she is the object of employment discrimination and review the results of the investigation with that person." (*Id.).* Finally, the Handbook states that "All Department Heads will regularly incorporate discussions of the non-discrimination policy at meetings with their staff." (*Id.* at 6).

In addition to the existence of written policies, Parkview provided training to its employees and management regarding equal employment opportunities. Bowers received training in human resources and was familiar with Parkview's policies on equal employment opportunities. (Bowers at 6-7). Gerig testified similarly. (Gerig at 43). Gerig also testified that the performance evaluation policy contains a procedure allowing for employees who believe their equal employment opportunity rights have been violated during the performance appraisal process to contact human resources. (*Id.*).

Parkview also provides regular training to both its management employees and its employees regarding equal employment opportunities. To this end, Parkview employs a full time diversity coordinator that conducts training programs in equal employment opportunity. (Dortch at 138). Employees are also advised that Parkview has a diversity council to address concerns in the area of equal employment opportunity. (*Id.).*

### DISCUSSION

Parkview attacks the jury's findings as to both liability and punitive damages. Each shall be addressed below.

### I. Parkview's Liability for Retaliation

To prevail on a claim for retaliation, a plaintiff must show that (1) she complained about conduct that is prohibited by Title VII; (2) she suffered an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice.

*Spearman v. Ford Motor Co.,* 231 F.3d 1080, 1086 (7th Cir.2000), *cert. denied,* 532 U.S. 995, 121 S.Ct. 1656, 149 L.Ed.2d 638 (2001). Once the plaintiff makes this case, the employer can defend itself by producing "evidence of a legitimate, non-discriminatory reason for taking the adverse employment action." *Id.* It is then up to the jury to decide whether the adverse action was actually taken for the proffered reason, or if it was intended as a retaliatory measure. As noted previously, on a Rule 50 motion this court must examine the full trial record to determine whether sufficient evidence supported the jury's verdict on the ultimate question of the alleged retaliatory discrimination.

Here, the jury concluded that Firestine clearly engaged in protected activity. Title VII protects the right of employees to oppose any "unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3 (2003). Employees are thus guaranteed the right to complain to their superiors about suspected violations of Title VII. *Thompson v. Potomac Elec. Power. Co.,* 312 F.3d 645, 650 (4th Cir.2002). Firestine testified that she did exactly that. The jury heard testimony that she complained to Vanness concerning her belief that she had been given a poor performance evaluation because of her religious affiliation. While Vanness denies that such a complaint was made, the jury was entitled to resolve this credibility issue and did so in favor of Firestine.

Parkview, however, argues that because Firestine's complaint had no basis in fact, she could not have either objectively or subjectively believed in good faith she was complaining of religious discrimination. Parkview cites to the facts that there was no previous animosity between Firestine and Bowers, no direct evidence that Bowers was discriminating, and that overall the performance evaluation was a positive one. However, Parkview raised a similar argument on appeal and this argument was rejected. *Firestine,* 388 F.3d at 235-236 ("...it is the role of the factfinder to determine

16

whether Firestine believed in good faith that Bowers's comments stemmed from a discriminatory animus." and "...the evidence established that Firestine reasonably believed she was complaining about an action in violation of Title VII based on Bowers's previous anti-Catholic comments and her allegedly negative comments in the evaluation just two weeks after she moved into a position to affect Firestine's job.").   Given the evidence at trial, in particular the evidence that Bowers had made comments criticizing Catholicism directly to Firestine previously and that Firestine had never received any written or verbal discipline for having breached confidentiality in the past, a jury could have concluded that Firestine believed in good faith that Bowers's comments on the evaluation were tainted by Bowers's  negative notions of Catholicism.   Thus, the court concludes that the jury was reasonable in concluding that Firestine engaged in protected activity.

The next question then, is whether there was sufficient evidence that the complaint made by Firestine, i.e. the protected activity, was recognized as a discrimination complaint by Vanness so as to put Parkview on notice of alleged discrimination and thus, to put it to the task of investigating the complaint.  *Tart,* 366 F.3d at 476 -47.  The jury clearly reconciled the evidence to conclude that not only did Firestine complain of religious discrimination but that the complaint was recognized and ignored by Vanness.   This is certainly a reasonable inference and is supported by Firestine's testimony.  Firestine testified, and the jury believed, that during the March 14 meeting she relayed information to Vanness regarding previous negative comments regarding Firestine's religion made by Bowers. Vanness, as an employee relations specialist entrusted by Parkview  with investigating complaints of discrimination, at the very least  *should have*  recognized Firestine's comments as a possible complaint of discrimination and inquired further.  Moreover,  the jury could have concluded that Vanness did recognize the comments as a discrimination complaint by virtue of the fact that

Firestine testified that Vanness took notes during the March 14 meeting.  The reasonable inference the jury could have made (and the court must assume it did)  was that Vanness lied when she said she didn't take notes and that she did so as a cover-up for her absence of investigation. Accordingly, the jury properly concluded that Parkview  was on notice that Firestine complained of religious discrimination.

It is similarly beyond quarrel that Firestine suffered an adverse employment action.  Reading the evidence favorably to her, she was removed from her position and ultimately terminated by Parkview.   As to whether the record is sufficient for a jury to conclude that the adverse action was taken because of the protected activity, here, it most certainly is.  Firestine presented evidence sufficient for a reasonable jury to find that after her complaint of discrimination and upon her return to work from FMLA leave, she was removed from her position as a secretary and told to work with an internal recruiter to find a new job.  The jury could have concluded from the evidence that this decision was management's retaliation against Firestine for her complaint of discrimination or, to avoid having to make a difficult decision about which employee to protect.  Indeed, Parkview was put on notice of two potentially volatile situations, a claim by Bowers that Firestine was publicizing her sexual orientation and a claim by Firestine that Bowers was acting inappropriately as a manager because Bowers took issue with Firestine's religious affiliation.  A jury looking at the evidence could reasonably infer that Parkview chose to protect Bowers at the expense of retaliating against Firestine.

It was similarly a reasonable inference, particularly given the jury's ability to judge the credibility of several of Parkview's managerial employees, that this retaliation further manifested itself in Parkview's ineffective attempt to secure her another position at Parkview.  Indeed, Brackett, a former Parkview manager at the time of trial, testified that  Parkview uses the internal recruiter and

30 day transfer policy for employees it intends to terminate.  (Brackett at 101).  As a result, the jury's ultimate conclusion that Parkview engaged in illegal retaliation cannot be disturbed.

## II.  Punitive Damages Award

Turning now to the jury's finding as to punitive damages, Parkview makes several arguments with respect to reducing the jury's award of punitive damages.  One such argument, which would entail reduction to zero if the court accepted it, is based on the Supreme Court's ruling in *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 545 (1999), that punitive damages may not be awarded in any amount against an employer in a Title VII case on the basis of discriminatory acts by its managerial employees if those acts "are contrary to the employer's 'good-faith efforts to comply with Title VII' "; see also *Lampley v. Onyx Acceptance Corp.,* 340 F.3d 478, 482 (7th Cir.2003); *Anderson v. G.D.C., Inc.,* 281 F.3d 452, 459-61 (4th Cir.2002).  The second argument, is not quite so broad, and seeks remittance of the jury's punitive damages award because it is excessive.

### A.      The *Kolstad* Argument

Title 42 U.S.C. § 1981a authorizes punitive damages for Title VII plaintiffs if they can demonstrate that an employer acted "with malice or with reckless indifference to [their] federally protected rights." 42 U.S.C. § 1981a(b)(1) (2003).  This standard requires not "a showing of egregious or outrageous discrimination," but rather proof that the employer discriminated "in the face of a perceived risk that its actions will violate federal law." *Kolstad,* 527 U.S. at  535-36.

The Seventh Circuit has divided the *Kolstad* formulation into three requirements.  Specifically, the plaintiff must establish that the employer "acted with knowledge that its actions may have violated federal law" and that "the employees who discriminated against him are managerial agents acting within the scope of their employment." *Bruso v. United Airlines,* 239 F.3d 848, 857-58

19

(7th Cir.2001) (citing *Kolstad,* 527 U.S. at 535, 543). However, even if these two prongs are met, "the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.* (citing *Kolstad,* 527 U.S. at 545); see also, *Lampley,* 340 F.3d at 482.[11]

With respect to the first two elements, the *Bruso* court found that a plaintiff may demonstrate the requisite mental state by showing that "the relevant individuals knew of or were familiar with the anti discrimination laws and the employer's practices for implementing those laws." *Id.* Alternatively, the *Bruso* court opined, a plaintiff may demonstrate that the employer acted with the requisite mental state (reckless disregard for the plaintiff's federally protected rights) by showing the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions. *Id.* at 858 (citing *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir.2000)).

In light of the factual record developed at trial in this case, Firestine has squarely proven the

---

[11]Plaintiff suggests that *Kolstad*'s standard is "less stringent" than the punitive damages instruction given to the jury in this case and that a plaintiff may prevail if she shows **either** that managerial agents of Parkview acted with knowledge that their conduct violated federal law **or** that Parkview did not engage in good faith efforts to comply with Title VII.  This is the same objection plaintiff's counsel made during trial and is simply incorrect.  *See Bruso,* 239 F.3d at 857-58; *Kolstad,* 527 U.S. at  535, 543.   For this reason, the court overruled the objection at trial and concluded that the instruction accurately reflected the law on punitive damages as set forth by *Kolstad*.  Thus, the jury in this case was properly instructed on *Kolstad's* punitive damages standard  in Court's Instruction No. 28:

> ...An award of punitive damages would be appropriate in this case only if you find for Firestine  and then further find from a preponderance of the evidence:
>
> > First: That a higher management official of Parkview personally acted with malice or reckless indifference to Firestine's federally protected rights, **and**
> >
> > Second: That Parkview itself had not acted in a good faith attempt to comply with the law by adopting policies and procedures designed to prohibit such discrimination in the workplace.

(Emphasis added).

first two prongs of the *Kolstad/Bruso* standard.  There is no serious question that Vanness was not acting in a managerial capacity at the time of these events or that she was acting within the scope of her employment at Parkview.  Rather, the key factual issues before the jury were whether Firestine made a complaint of discrimination to Vanness, whether Vanness recognized that Firestine was making a complaint of discrimination, and whether Vanness took any steps to remedy or investigate the complaint.   Firestine testified that she made an oral complaint of discrimination; Vanness claimed that Firestine never mentioned discrimination, Catholicism or Lesbianism in any meeting with her.  As a result, it was undisputed at trial that Vanness conducted no investigation into Firestine's alleged complaint of religious discrimination.

Based on the jury's verdict as to liability, it clearly chose to believe Firestine's version of events.  During argument, defense counsel argued that Firestine never made a complaint of discrimination that Parkview *recognized* as such.  While this may be a logical reason why Vanness did not investigate Firestine's *discrimination* complaint,[12] the jury was entitled to disbelieve Vanness' story and conclude from the evidence that a complaint of discrimination was made and Vanness chose, in contravention of Parkview's established policies, to ignore it.   Further, there was a discrepancy as to whether Vanness took notes of her meetings with Firestine.  Firestine claimed she did; again, Vanness denied it.  A jury certainly could have concluded from the evidence that Vanness did not take notes as she testified,  or, worse yet, that she took notes as Firestine testified but lied about it later to avoid liability under Title VII.  Inasmuch as this Court is not permitted to make credibility determinations or to weigh the evidence on a Rule 50 motion, the jury's decision to credit

---

[12]Vanness did, it is undisputed, at least begin investigating Firestine's complaint about her employee evaluation.  She contacted Bowers to set up a meeting between Firestine, Bowers and herself. However, before this meeting took place, Firestine took FMLA leave.

the testimony of Firestine  over that of Vanness cannot be disturbed..  Thus, the evidence supported

the jury's conclusion that as a managerial employee of Parkview, Vanness intentionally acted to

deprive Firestine of her rights.

Parkview is still entitled to prevail on its *Kolstad* argument, however, if it demonstrated at

trial that Vanness' failure to investigate Firestine's claim of discrimination was contrary to

Parkview's good-faith efforts to comply with Title VII.  *See Kolstad,* 527 U.S. at 545 (""an employer

may not be vicariously liable for the discriminatory employment decisions of managerial agents

where these decisions are contrary to the employer's good-faith efforts to comply with Title VII.").

This good-faith exception rests on the notion that the existence and enforcement of an anti-

discrimination policy shows that the employer itself "never acted in reckless disregard of federally

protected rights." *Lowery v. Circuit City Stores, Inc.* 206 F.3d 431, 445 (4th Cir. 2000) (quoting

*Kolstad,* 119 S.Ct. at 2129).

In other words, the jury could not punish Parkview for malicious or reckless conduct by Vanness

which was inconsistent with Parkview's good faith efforts to comply with Title VII.  *Bruso,* 239 F.3d

at 858 ("An employer's good faith efforts to comply with the requirements of Title VII demonstrate

that the employer itself did not act in reckless disregard of federally protected rights, thus making it

inappropriate to punish the employer for its employees' contravention of its established policies.").

"This principle is meant to advance the purposes of Title VII by encouraging the remediation and

prevention that lie at the heart of the statute's goals.  It would defeat these purposes to hold an

employer strictly liable for the acts of rogue managers when it has made every effort to comply with

Title VII's requirements."  *Hardman v. AutoZone, Inc.* 2004 WL 303268, *5 (D.Kan.,2004).

The evidence at trial demonstrated that Parkview has an anti-discrimination policy that was

routinely shared with employees.[13]  Indeed, even Firestine admitted at trial that she was aware of the

policy and it had been distributed to her upon hiring.  Further, there is testimony in the record

supporting the conclusion that Parkview's human resources department routinely investigated claims

of discrimination made by employees and attempted to remedy those complaints.  Parkview provided

Equal Employment Opportunity training for its employees and Vanness testified that she attended

EEO seminars (Vanness at 104).  Vanness also testified that she personally had investigated between

75 and 125 internal discrimination complaints.  (Vanness at 105).  Dortch guessed that he had

investigated somewhere around 50 to 60 employment discrimination complaints while at Parkview.

Dortch also provided testimony that Parkview encourages employees to bring discrimination

complaints to human resources for investigation and that Parkview has an "open door" policy because

"[discrimination] is one thing we will not tolerate..." (Dortch at 139).

Yet, while the existence of a written policy is relevant to the punitive damages equation, it

is not enough that the employer merely have in existence a written or formal anti-discrimination

policy. *See Bruso,* 239 F.3d at 858 ("Every court to have addressed this issue thus far has concluded

that, although the implementation of a written or formal antidiscrimination policy is relevant to

evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself

to insulate an employer from a punitive damages award."); *Romano v. U-Haul Internat'l,* 233 F.3d

655, 670 (1st Cir.2000) ("[A] written non-discrimination policy is one indication of an employer's

---

[13]During closing argument, Plaintiff's counsel asserted that Parkview's antidiscrimination policy did not comply with Title VII.  In particular, counsel argued that because the antidiscrimination policy put into evidence by Parkview did not specifically contain an "anti-retaliation" provision, it did not comply with  Title VII.  However, Plaintiff has not proffered any legal analysis to support this factual conclusion. "Retaliation is merely another form of discrimination."  *Schobert v. Illinois Dept. of Transp.*, 304 F.3d 725, 732 (7th Cir. 2002).  Thus, to the extent a policy prohibits "discrimination" in the workplace, it encompasses retaliatory conduct.  Moreover, in this case, Parkview's grievance policy specifically includes retaliation as a prohibited form of discrimination.  Thus, the court discredits this argument.

efforts to comply with Title VII. But a written statement, without more, is insufficient to insulate an employer from punitive damages liability.") (citations omitted).

Rather, the employer must demonstrate that "it engaged in good faith efforts to *implement* an antidiscrimination policy." *See Bruso,* 239 F.3d at 858  (emphasis added); *Romano,* 233 F.3d at 670 ("A defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate."); *Passantino,* 212 F.3d at 517 ( "[A]n employer must show not only that it has adopted an antidiscrimination policy, but that it has implemented that policy in good faith.").  "Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." *Id.; see also Cadena v. Pacesetter Corp.,* 224 F.3d 1203, 1210 (10th Cir.2000).  Indeed, "even if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover damages if she demonstrates that the employer failed to adequately address Title VII violations of which it was aware." *Davey v. Lockheed Martin Corp.,* 301 F.3d 1204, 1210 (10th Cir.2002); *Lampley ,* 340 F.3d at 482-83 (evidence was sufficient for jury to believe that defendant failed to engage in good faith efforts at Title VII compliance after it became aware of plaintiff's retaliatory discharge claim).

In this case, the jury was presented with evidence from which it could conclude that everyone in the chain of command from Vanness to Dortch chose to ignore Firestine's repeated complaints of discrimination. Firestine testified that she complained directly to Vanness on March 14.  In addition, Bowers testified that she told both Vanness and Dortch that " "Cindy feels she got a bad evaluation and that she thinks it's because she is Catholic and I'm a Lesbian."  (Bowers at 201).   Despite

knowledge on the part of Parkview's top human resources officials that Firestine, at the very least, was communicating her belief of religious discrimination to other employees at Parkview, they did not investigate the fact further.  Instead, they opted to remove her from her job.  Moreover, Firestine testified that she repeatedly attempted to tell Vanness in the March 28 removal meeting that this was occurring because of religious discrimination and Vanness ignored and/or "cut off" Firestine's complaints.   Thus, the jury could conclude that rather than looking into the substance of her complaints or investigating Firestine's comments to coworkers, Parkview, in contravention of its own antidiscrimination policies, removed Firestine from her position.  Accordingly, the jury was entitled to, and did find, that Parkview did not engage in good faith efforts to implement its own antidiscrimination policies.  *See Lampley*, 340 F.3d at 483 (citing *Bruso* and concluding "[b]ecause a jury could have found that Onyx engaged in a cover-up rather than a good-faith investigation of Lampley's retaliatory discharge claim, we find that the punitive damages issue was properly before the jury); *Bruso,* 239 F.3d at 861 (concluding that evidence of a sham investigation designed to discredit the plaintiff was sufficient to defeat the defendant's motion for judgment as a matter of law on punitive damages); *Lowery*, 206 F.3d at 445 (sincerity of defendant's commitment to a company-wide policy against discrimination called into question by evidence of racially discriminatory attitudes of two top executives and evidence of employees who testified they felt ignored or intimidated for complaining sufficient for jury to conclude that defendant's purported efforts to comply with Title VII  were not taken in good-faith).  But cf. *Hatley v. Hilton Hotels Corp.,* 308 F.3d 473, 477 (5th Cir.2002) (denying punitive damages instruction where defendant had a well-publicized policy forbidding sexual harassment, gave training on sexual harassment to new employees, established a grievance procedure for sexual harassment complaints, and initiated an investigation

25

of the plaintiff's complaints).

In sum, while Parkview did present evidence that it maintained formal anti-discrimination policies and that it provided training to employees on those policies, from the evidence presented the jury could reasonably conclude that Parkview engaged in a cover-up, contrary to these established policies, designed to protect Bowers at the expense of Firestine. As a result, the jury's finding that punitive damages were warranted is supported by the evidence and was a proper determination.

### B. Remittitur of the Jury's Punitive Damages Award

Parkview also makes two arguments calling for reduction of the punitive damages award. As detailed below, neither is persuasive.

#### 1. *The Punitive Damages Award Does Not Offend Due Process*

Generally, punitive damages awards may be decreased by the court for two reasons: (1) the award is so excessive that it offends due process; or (2) the award is simply "higher than the evidence warrants." *Lust v. Sealy, Inc.*, 383 F.3d 580, 590 (7th Cir. 2004). Here, Parkview implies that the jury's punitive damages award offends due process; Parkview frequently cites *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the leading case on that issue, and it complains that the ratio of punitive to compensatory damages (roughly 40:1 here)[14] is excessive. However, this argument is unavailable in Title VII cases:

> When Congress sets a limit, and a low one, on the total amount of damages that may be awarded [as it has in Title VII, *see* 42 U.S.C. § 1981a(b)(3)(D)], the ratio of punitive to compensatory damages in a particular award ceases to be an issue of constitutional dignity. . . . The purpose of placing a constitutional ceiling on punitive damages is to protect defendants against outlandish awards . . . . That purpose falls out of the picture when the legislature has placed a tight cap on total, including

---

[14]The ratio is actually closer to 2:1 if you consider that Title VII entitles Firestine to backpay and the court previously awarded her $21,300 in backpay plus $2,420.00 in prejudgment interest.

punitive, damages and the courts honor the cap.

*Lust*, 383 F.3d at 590-91.  Accordingly, the jury's award of punitive damages against Parkview is not (and cannot be) a violation of due process.

> 2. *The Punitive Damages Award Is Not Higher Than the Evidence Warrants*

Constitutional concerns aside, a punitive damages award can also be reduced if it is "monstrously excessive" or has "no rational connection to the evidence."  *E.g., McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 516 (7th Cir. 1993).  Parkview argues that the award ($40,315) should be reduced under this standard because "even if Firestine's version of the facts are believed, there is nothing reprehensible or intentional about [Parkview's] conduct."  In other words, Parkview looks at its offense as a mere failure to recognize Firestine's complaint as one of discrimination, and claims that this oversight is not the type of "reprehensible" conduct for which punitives are appropriate.  However, as explained earlier, the jury did not have to interpret the evidence in this way.  While the jury could have regarded Parkview's failure to investigate Firestine's discrimination complaint as a simple miscommunication between Firestine and Vanness, it could also have believed that Vanness recognized the complaint but refused to act on it.  The jury could even have believed that Vanness took affirmative steps to sweep the complaint under the rug by destroying her notes on Firestine's complaint or lying about having taken the notes in the first place.  If the jury drew these reasonable inferences from the evidence, it could well have decided that Parkview's conduct was reprehensible enough to warrant $40,315 in punitive damages.

Moreover, the punitive damages award is in line with other cases with similar or less egregious facts; indeed, compared with other cases, the award seems a bit low.  For instance, in *Lust*, the plaintiff was subjected to a few relatively tame comments such as "isn't that just like a woman

to say that" and "you're being a blonde again today," and then was passed over for a promotion because her supervisor assumed that a female with children would be unwilling to relocate.  383 F.3d at 583.  However, her employer quickly discovered and rectified this discrimination by promoting her to a comparable position just two months later.  *Id.*  Nonetheless, the Seventh Circuit felt that $150,000 in punitive damages were appropriate, *id.* at 591, which makes the $40,315 award in this case seem like a lucky break for Parkview – and certainly not "monstrously excessive."  Accordingly, the Court declines to reduce the jury's award of punitive damages.

## CONCLUSION

Based on the foregoing, the Defendant's Renewed Motion for Judgment as a Matter of Law and its Motion to Alter/Amend Judgment is DENIED.  The STAY previously imposed on the proceedings to enforce the judgment in this case is hereby lifted.

 The Plaintiff shall have ten (10) days from this Order  within which to submit to the Court a consolidated filing related to her prior requests for attorneys fees and costs in this matter. Once Plaintiff files her consolidated request for attorneys fees and costs along with supporting documentation,  Defendant shall have ten (10) days to file a consolidated objection to Plaintiff's request.

SO ORDERED.  This 2nd  day of May, 2005

s/ William C. Lee
United States District Court
Northern District of Indiana
